Good morning. May it please the Court, David Loy representing the Koala. I'll plan to reserve about five minutes for rebuttal if I may. That's fine. Just watch your own time, please. Absolutely. Thank you, Your Honor. The District Court erred in dismissing this case, both on the Eleventh Amendment and on the merits. On the Eleventh Amendment, the District Court erred because the complaint seeks only prospective relief to enjoin an unlawful practice going forward and does not seek any compensation for any losses incurred in the past. On the merits, the District Court erred because the defendants are continuing to enforce an unlawful disqualification of student newspapers from a pool of funds dedicated to private student speech that remains open and available to other groups for other forms of speech. On the facts pleaded, the complaint states several First Amendment claims. First, it states a claim that the defendants are violating the Free Press Clause of the First Amendment because under the Free Press Clause, as the Supreme Court explained in Minneapolis Star, the government may not single out or target the press. And the Court explained the power to discriminate against the press is ultimately the power to destroy the press. Now, the government can discriminate and target the press in at least two ways. One, it can bleed it dry through selective taxation, as recognized in Minneapolis Star. Or two, it can starve it on the vine by depriving it of the equal opportunity to qualify for certain revenue, as recognized in Pitt News. That was Judge Alito. Correct, Your Honor. Judge Alito on the Third Circuit. Yeah. Not long before joining the Supreme Court. I looked, though, since we're not talking about a tax, the Pitt opinion talks about any burden on the press giving rise to a presumption that's got a lot of teeth. And so my question really is, what about – this is a burden that's different because it's the removal of a subsidy. Is there any case that looks like that, as opposed to burdening by taxing ink or taxing paper? Not yet, Your Honor. This is that case. But I believe this case is indistinguishable in principle from Pitt News and Minneapolis Star because the selective denial of revenue is the selective denial of revenue, regardless of whether that revenue takes the form of advertising charges, tax expenditures, or direct grants, or any other form of revenue for which the press is otherwise eligible. So if we accept that the government doesn't have to grant a tax deduction at all, but if it creates a tax deduction generally applicable to businesses, like depreciation on equipment, it can't disqualify the press from deducting the depreciation on printing presses. I'd like to think about a different hypothetical, if I could. It's a little closer to home. I don't think you're saying that the regents couldn't decide, or for that matter, the Student Senate couldn't decide to go green and not have the limited student activity funds devoted to print media. But if they did, I think your theory is that that would still be a burden because the funding would have been removed, and then we'd get to the next step where the government would have to show a compelling interest. Here, the government hasn't shown any interest. The case didn't get that far. Their briefing doesn't go that far. Correct, Your Honor. Is it your position that they would just have to advance to the next step? So to answer that question in sequence, yes, Your Honor, the briefing did not get to the stage of discussing compelling interest because the district court sort of dismissed at the threshold that the Free Press Clause didn't apply. If the university had simply said, we will not fund print of any kind, newspapers, banners, posters, flyers, invitations, that would be a different case. I think the Free Press Clause would still apply. I think the analysis might be different, and we would have a different argument. But on the facts pleaded in this case, the university and the defendants did not disqualify all print. They disqualified only print newspapers. Funding remains available for other forms of print, banners, posters, flyers. Also, they did not go completely green. The student council continues to print its own newspaper in the exercise of its own speech. And so clearly they recognize the value of print. Furthermore – But they were just cutting off the subsidy of print media. They didn't say you can't print your newspaper. Well, correct, Your Honor. They cut off access to the pool of funds dedicated to student organizations for student speech. Right. And I'm just positing that there are other circumstances where that might be a burden on the student press that would be acceptable if we got to the second part of the inquiry where a compelling government interest would have to be shown. But we didn't get that far in this case. Correct, Your Honor. We did not. And I'll also note a point in the record. If you look at ER88, it's the student government funding guide. They specifically declined to fund website hosting. So this is not a case where they've said we want to go green across the board. That would present different issues, and we would still have an argument, but it would be a different case. Is that if we go to – if we went to the reasonableness and compelling interest, is that where the issue that triggered this activity would be resolved? That is, the campus was outraged, somebody outraged by the publication. It was provocative and used the N-word deliberately. This is a college community, and the university has a concern about fairness and well-being on the campus among the students. Berkeley has had this issue with the Sproul Plaza up in Berkeley, and it's a balance between the First Amendment and maintaining civility on the campus. So is that where that balance would be achieved? Well, those are issues that could be briefed on remand, Your Honor. Those are not issues that the university has raised in its briefing on the crisis. No, I understand, but I'm asking where it does get resolved. Well, it gets resolved at multiple levels. So first of all, it would get – it could be a concern that's addressed under the Free Press Clause, and I've addressed that in my brief where there may be issues about that where the university, if they were to raise that concern, there are alternative means to address that. There's a right to a pro rata refund of student activity funds that go to activities to which students object, whether it's this newspaper or others. But that doesn't really address what Judge Fischer is speaking to, which is that the regents may have had – and they haven't raised it here, but certainly likely had a concern about maintaining civility and even campus safety, right? It's a college campus. It's close quarters and whatnot. It's a college campus with a forum specifically dedicated to robust student speech. Yes, but there's also – but not no holds barred, right? That's going to be the concern of the university. I fully appreciate we haven't gotten into that yet, but the university also has to be concerned about civility and not inciting unrest or, you know, even a danger. If we got to the point where there were physical altercations or riots, that would be an issue. There's nothing in this record to suggest that this debate has been anything but rhetorical. And, yes, there are a lot of heated views on both sides, and that is exactly what the First Amendment protects, especially on a college campus, with a forum expressly dedicated to robust debate on a multitude of topics from a variety of viewpoints. And the university was free in the exercise of its own speech, which it did, to condemn the publication. But what they can't do is to censor or deny access to a forum solely based on viewpoint. And that's what we're talking about here, viewpoints on topics otherwise embraced within the forum. Their response is going to be that the university, of course, didn't just remove funding for the koala but took across-the-board print media. They closed the forum. That's their argument. They opened the forum. They closed the forum. All right. Well, there's two responses to that. One is that on the facts pleaded, this is a forum that remains open to all student organizations except student newspapers. And I realize the defense has an alternative characterization of that forum, but on a 12b-6, I'm entitled to have the complaint construed in the plaintiff's favor. Well, their argument is that the Supreme Court has said you determine the scope of the forum by looking to see where the speaker wants access. Right. So since you're at the podium, do you want to respond to that? Absolutely. And we seek access to what we had before, which is the forum of campus activity funds available to all student organizations, which is how the forum has historically been defined on power and practice, on the facts pleaded in my complaint, from which student newspapers have been expelled. And as I've argued, the exclusion of student newspapers from a forum designed for robust student speech is itself unreasonable in light of the purpose of the forum before we even get to disguised viewpoint discrimination. Your brief includes an argument that is, I think, a subtle one, but I want to make sure that I understand it. You talk about the regents not being allowed to disfavor certain types of speech within a forum. So if the forum is the student activity fund writ large, there's presumably funding in there for ultimate Frisbee teams or whatever, but they have nothing to do with speech, but also theater, drama, dance, other forms of First Amendment-protected activity, right? Correct. And so I think you cite a case out of Virginia for this notion that once a forum is open, the government can't pick and choose the type of speech that it will allow to go forward. And there's the sidewalk chalk art case that you described, for example. And so I think your point is that of all of the student activities that receive funding, some of them, not just print media, are entitled to First Amendment protection. So if the government really wanted to close the forum, it would have to do so without just singling out the newspapers. Correct. And potentially, if the university were to eliminate student activity fees completely or eliminate student activity funding for student organizations across the board, we would have a different case. So if I'm understanding your argument correctly, it's that they opened a forum. It's the student activities fees. And, of course, opposing counsel's argument is they opened it, they can close it. And your response is they're only closing a slice of it. Correct, Your Honor. And my argument is that to allow them to slice and dice the forum in that way would turn Rosenberger into a dead letter. Is there any case law that comes closer to addressing this argument other than the two that you cited, which are both of their sidewalk cases? Well, I've cited cases. Go ahead. I've cited cases in the brief about sidewalk chalking in front of the White House. And the government said, you know, it's not a public forum when used for chalk. And the court said, no, it's a public forum, chalk, leaflets, what have you. And in that case, right, they decided there was a compelling government interest in not having basically graffiti right out in front of the White House. That was a public forum case, not a limited public forum case. Right. And what I cited that case for was the principle that it's one forum. And then once you establish that it's a forum, you apply the standard of review on a restriction of speech in that forum. And, yes, in that case the restriction survived the standard of review. And we never got to that next step in our case. Correct, Your Honor. Okay. Exactly. Did I get a clarification on the forum definition? The district judge said it was A.S. funding of student print publications. You proposed, I believe, that it's student activity funding. Does it have you also in your argument seem to maybe restrict that a bit, narrow it down to speech and other forms of communication? Well, my position is the forum is student activity funding for the speech of registered student organizations, which takes multiple forms. They organize events. They bring in speakers. They show films. They have art shows. It's not just activity funding because you talk about in your complaint, you have a variety of activities which may have speech involved, but it's a laundry list of all sorts of activities. Does it get narrowed down a bit to those that are seeking to advocate something or express particular opinions? No, Your Honor. It's speech of any kind. Speech can be artistic, cultural, religious, political, humorous, satirical. There are a multitude of speech events alleged in the complaint that the Campus Activity Fund supports, but they're all speech protected by the First Amendment. There may be other activities funded by the student government that are not protected speech, but the fact that speech and non-speech activities might occur within a forum doesn't make it any less of a forum for speech. People can play soccer in the park or they can hold rallies or put on plays. It's a forum anyway. You slice it. So could they have closed the whole forum, meaning student activity fees? We addressed that in Arizona students to some extent. Yes, Your Honor, and potentially yes. I mean, that would be a different question, and I certainly have fallback arguments that that might be impermissible. We're not there yet because ---- I assume your argument would be that in this particular case, then we'd have to talk about retaliation. But set that aside for a minute. Could they just wake up tomorrow or could they have woken up maybe the week before the Koala published this newspaper and said we're just going to close student activity fees? Well, the entire university could potentially make that decision. Student activity funding is set by university policy. Right. Your brief explains that in detail, which I appreciated. But you see that I think the question that is really kind of the logical result of your theory is that I think what you're really saying is they didn't close the forum. They closed part of it. And my question is could they have closed the whole thing? I mean, potentially yes, but if the closure of the entire forum properly defined in my favor on 12b-6 were motivated by viewpoint discrimination or retaliation, there would still be an argument. It would be a different argument. I admit it might be a harder argument. Again, we're not there yet because that didn't happen. Okay. Judge Shea? None. I'll reserve my time. Thank you, Your Honor. Thank you, Counsel. Good morning, Your Honors. Please excuse the Court. I'm William Carroll. I represent the defendants, Justin Pennish and Chancellor Kosla. And I would like to begin my remarks briefly with the 11th Amendment, but I'll also move on to the forum definition issues, which I would appreciate clarifying for the Court. The 11th Amendment, this is boiled down to essentially two. I mean, Mr. Loy has sought to boil down the test to whether or not the sole question is whether or not the relief sought is prospective. And under Ex Parte Young, that's the issue here, is whether the request for injunctive relief falls within the narrow exception of Ex Parte Young. That has been recognized as providing an exception to sovereign immunity in the case of where an individual sued in their official capacity is stripped of their sovereignty in order to comply with federal law, in order to address an ongoing violation of federal law. Here, and that stands in contrast to where the state is a real party in interest, in which case, as in the Ford Motor Company case in the Supreme Court, where the issue is over the payment of money, expenditure of funds from the state treasury. In those instances, the government is entitled to assert its sovereign immunity, and the exception of Ex Parte Young does not apply. So the question becomes, when you have a prospective order to pay money from the state treasury, does that fall within the exception of Ex Parte Young? And our answer is that it does not, that the prospective nature of the relief in itself is not determinative. You can have situations in which the state is called upon to pay money at points in the future, and we cite cases to that effect. We cite the two Seventh Circuit cases, Quinn and MCA Realty. We cite the Eleventh Circuit case, Seminole Tribes. In this case, though, this university is collecting a student fee, right? Correct. If these plaintiffs are granted relief prospectively, will the student fee be affected? The size of that? The collection of the student fee is not necessarily, I guess, is my answer to the question. So what we're talking about in this case is a finite fund, and the question is how AS allocates its share of that. Correct. What's the financial impact on the chancellor of UCSD or the university? They won't have to dig in and raise more money. That's just a question of allocation, isn't it? I suppose that would be true in almost any case that I can think of, Your Honor, where the state is- Well, not really. I think in the much more typical case, a benefit would have been terminated or cut off, and Judge Fischer's question is the same one I have. They're collecting the very same student fee from each student, I think sort of a head tax, right? They all pay in as a function of how many students they've got, and then that pie is divided in a certain way that does or does not allow this entity to apply for funds. But I don't think the outcome requires, costs the state any money. Certainly one of the aspects of sovereignty is being able to decide how the state is going to expend its funds. It's a different point, but to Judge Fischer's, to answer his question, which is now mine as well, is it going to cost the state any money? Not necessarily. But again, I think that that begs the issue, with all respect, insofar as the question isn't whether the state is going to lose money as a result of this. The question is whether the state is being forced to expend its funds in a particular way. And sovereign immunity would insulate the state from having to do that, and that's really the bottom line issue here is the essence of the relief sought about obtaining state funds so that the state cannot use it in some other way that it chooses to use them. Yeah, but it could here, because all they're asking for is eligibility to apply for funds, but the AS still has the ability to allocate to press in lesser amounts, doesn't it? You had a much stronger argument on the 11th Amendment when they were asking to give us the money back. They're amended complaints as we just want to apply. And as the district court said, that was a case of artful pleading, and that there was little question that what Koala wants hasn't changed one iota. Okay, but if we're required to believe them and to take that as correct, then that gets you right back to Judge Fischer's question. What about that? They just want the opportunity to apply. What's your response? My response is that the eligibility requirements are so minimal here so as to be immaterial, that they're largely ministerial and involves registering and applying and having your application reviewed so that there is no distance to be traveled between being eligible to apply for funds and, in fact, receiving the funds. Everybody who applies gets money? I don't know if anyone has ever been turned down. What I'm saying is that the eligibility requirements, as set forth in the standing rules, are minimal. The pot hasn't changed, has it? The same amount of money is collected depending upon the number of students. Isn't that correct? Certainly the pot can fluctuate. So it's the pot's remain. So even though they took the money away here, the money remained and it was used for other activities. That's correct. Okay, so the pot remains the same and the state's not allowed any money if, prospectively, they're back in. I believe it's a similar point that we addressed a moment ago. That is true. And, again, the affront to sovereignty here is that the state is not able to spend the money in the way that it chooses. I appreciate that argument. Do you want to turn to the First Amendment? I would. And I would like to especially address the forum analysis beginning with the definition of the forum. It's an important question here, and I want to be sure that we've got the Supreme Court's mandate and Cornelia's firmly in focus, which is that the forum is to be narrowly, the parameters of the forum are to be narrowly defined in accordance with the channel of communication sought by the plaintiff. So in this case, there is no question about what the parameters of the forum is. The forum that the plaintiff sought to join, to enter, is the media funding category that is a, and I do want to emphasize this, the media funding category is something that is established under the standing rules. In order to change that category, it required a vote of the entire student senate, the elected representatives of the students of the University of California San Diego. But you just said that's ministerial. These categories are ministerial in the application process. The regents have a different policy for student activity funding writ large, and it's very broad. Why do we look to the student guidelines? Because the – They do strike me as ministerial, by the way, so why do we look there? The ministerial requirements are the eligibility requirements to apply for this particular set of requirements. Right, but isn't the only substantive provision in the student guidelines that funding can't be denied on the basis of viewpoint or something? That is one of the guiding principles, correct. I think we do have the teaching of Cornelius firmly in mind, and I appreciate your calling our attention to that. I think that's right where this focus is for me. I'm searching for a case law that really answers the question that we've got. So let me do this and ask you to correct me and tell me what I'm missing. The parties agree that this is a limited public forum, right? Correct. Rosenberger tells us that, so we don't have to spend a whole lot of effort on that one, right? A student activity fee at a public university is a limited public forum. Okay, we know that. Then we have to define it in reference to where the speaker wants to gain access, which is the point you're making now. Under Cornelius, you want us to define it narrowly, right? The channel of communication. Right, and your position is it's just media funds, not the larger student activity fee, and the thesis of your briefing over and over is that we opened this forum for this purpose, we can close it. Correct. The state has an inherent right to close a forum that it's opened. Okay, so here's my problem. Where have we ever said, where has the Supreme Court said, or really, frankly, any circuit, any court, that the government can open a forum and then close just a slice of it, close a smaller slice of it in response to a speaker's content? Because I don't think there's much doubt that this was closed in response to content, but I certainly can recognize you haven't conceded that point. We haven't gotten that far in the litigation. Nevertheless, the case law that talks about opening a forum and closing a forum talks about the same forum, and it seems to me quite clear that you're closing just a slice. So if we were to accept the plaintiff's definition of the forum, which is the Student Activity Fee Funding Program writ large, then we are now back into Rosenberger, and we're talking about a restriction on the forum. So I think that that's what the court is referring to as closing a slice of the forum. It's really a restriction on the forum. And what would you have to show if you wanted to do that? You have to show that the restriction is reasonable in light of the purposes of the forum and that there was no viewpoint discrimination. And isn't that where you get to Judge Fischer's, I think, very important point, which is this is a college campus. It's a diverse campus. There's important lessons to be taught about the exchange of ideas, but in a respectful and civil manner. Isn't that where that balancing would come in? We didn't get there here. In other words, the university may very well win that fight, but we didn't get that far, right? Well, we have addressed both aspects of the test in our briefing, and the district court ruled on each of them. So the district court concluded that the restriction here, if you accept the larger definition of forum, was reasonable in light of the purposes of the forum. And the district court also concluded that the alleged motive for the restriction, that is viewpoint discrimination against the koala, was irrelevant because this is a content-neutral and viewpoint-neutral decision that eliminated media funding across the board. Would it be a relevant counsel in a retaliation theory? The third prong is to show a nexus, right? Isn't that the showing of nexus, that the university was quite quick to denounce this very offensive speech? So on the retaliation claim, the court is, of course, correct that motive is a very important inquiry under retaliation, but the unique aspects of this particular retaliation claim and what distinguishes it from Arizona students is that this is, what the plaintiffs are attacking here is a legislative enactment, a prospective rule of general application. And the Grossbaum case in the Seventh Circuit goes into, I think, very helpful analysis as to why that does not make sense. Furthermore, and Grossbaum relies in part upon the Supreme Court's decision in O'Brien, which rejects an inquiry into the legislative motive and establishes the groundwork for many, many subsequent decisions, including decisions of this court, which refused to overturn a facially constitutional statute on the basis of an alleged improper motive. So that's precisely what we've got here. We've got a legislative enactment that the plaintiffs are alleging was motivated by improper considerations. Justice Kennedy recently looked to the Colorado Civil Rights Commission and got a 7-2 majority on the motivation issue. In that case, what do you think, how is that relevant, if at all, to this case? Is there a new standard or is there some circumstance where the unspokenness of the legislative or adjudicatory body can be seen as highly prejudicial to the constitutional issue? I do not believe that the court's referring to the recent decision by the Supreme Court in the Mattrapiece case decision. I do not believe that the court has in any way overturned or even questioned the wisdom of O'Brien. So without commenting on the particular facets of the Supreme Court's concern with the Colorado Commission, here we're dealing with a legislative act, and O'Brien applies to legislative acts. And the Student Senate is very much operating as a legislature, as an official unit of the University of California. So I think that's what distinguishes this case from Mattrapiece. Counsel, I wonder if you could, here's my concern. I can't find a limiting principle to your idea about this closing just a slice of the forum, which is causing me a lot of concern. So here's my hypothetical. Someone I ran by my law clerks. I'd like to run it by you and see what you have to say. Imagine a student election where the candidates are invited to sign up for an opportunity to speak in a student union, and they each get their own soapbox or podium or something to make their speech. I think you and I would agree that that's a limited forum because Rosenberger tells us it is. But in the hypothetical, a student shows up. The one at soapbox four begins to speak from a neo-Nazi student perspective, a neo-Nazi party, and many people find the message very offensive. Would the school be able to say we're closing that forum, we're going to take out podium number four? Sounds like viewpoint discrimination, Your Honor. Well, that's what his point is. That's what his point is. He thinks that the timing here and, in fact, frankly, the record is that the regents denounced this speech. That's right. So if your response is we open the forum, we can close the forum, and his response is, well, you're actually just closing a slice. That's why I come up with this hypothetical about I'm very concerned that if we were to rule the way you're asking, it would allow for this type of isolation of content. Not at all, Your Honor. Tell me why not, please. What's critical here is the content neutrality of the media. So in my hypothetical, they said, oops, we're closing podium four. Say anything about the neo-Nazi party, which is closing podium four. I guess my reaction to the hypothetical is that I don't know how you would define that forum as consisting of a single podium under those circumstances. Well, my hypothetical, this guy signed up. Actually, it's the very same way. This guy signed up for podium four in response to the larger invitation to come. All the candidates are welcome, and he signs up for podium four, just like there's a large invitation for the student activity fund, and this group signed up for media funds. Yeah, but the proper definition of the forum in the hypothetical clearly is that stage, that setting in which all four podiums are. So they'd have to close them. They'd have to close the entire forum, which they could, and that would be perfectly appropriate. It would affect all viewpoints equally, and it would be content neutral, which is exactly the situation we have with the media amendment. Every organization was affected the same way. Yeah, except that was one aspect of a general discussion. There was the student union forum, but there were other ways on the same issue, other forms of communication that didn't get shut down. So they shut down a forum to discuss political issues. They've shut down that. They fund various forms of that, but they also funded this subset where the speakers could come in and stand on these soap boxes. So they shut that down. But they don't shut down all the other aspects of the open forum. I guess in the hypothetical, the question would be, did they choose to shut down that particular event? Was it viewpoint motivated or not? And the other side of the coin is if we take your example and you say, all of the student activities that had some expressive First Amendment content to them were affected the same way, then I think you've got a problem that what they did disproportionately burdens the student newspapers. You're back to now First Amendment press, aren't you? Different claim, different standards. Surely the Frisbee team only needs a few flyers, right? But this is a newspaper, so it disproportionately burdens the newspaper. So are we going back to the free press? I'm not trying to whipsaw you, but it does seem to me that you can't have it both ways. Well, let's return to the free press analysis there then. Okay. Going back to Pitt and Justice Alito's caution that you can't disproportionately burden the press without really a presumption with some real teeth in it arising. So why wouldn't the Media Act, I guess is what it's called, disproportionately burden the press? Because first we have to focus on what the alleged burden is here. We're talking about the withdrawal of a modest subsidy. And as Harris v. McCrae says, there's no equation between the refusal to extend a subsidy and a penalty. So we're talking about something very different than what the Supreme Court taxes cases deal with and Pitt v. Papert deals with. We're talking about the withdrawal of a modest subsidy that in itself plaintiff has conceded they have no right to. Yes, but all the budgets are shoestring budgets. And my question is, doesn't it disproportionately burden the press? Not to an extent that triggers protections under the free press clause. Why not? Because the sole burden here, first of all, as the Court has recognized, they can continue publishing their paper. And in fact, they have continued to publish their paper. Electronically. And in print. They've raised funds through fundraising and through advertising. And they continue to publish their paper without a modest subsidy from the university. So the burden is minimal here. And it doesn't resemble anything that any court to date has recognized as a violation of the free press clause. So the only burden that was imposed here is a burden that said to the QALY, you must go out and raise $400 to print your publication. In response to opposing counsel, I asked about this difference. There are these cases about taxing the press with ink and paper and whatnot. And I asked, is there any case law that helps us with the removal of a subsidy? Are there cases you want to call our attention to? I would call your attention to the cases that we've cited which distinguish subsidies. I've read those. Nothing else, right, on that point? Not on that particular point. Okay. So I do want to return briefly to the question of reasonableness. Because I think that there is, you know, I want to be clear about what the district court has ruled and why the district court was correct in ruling the way that it did. So the district court, in the alternative, because he did find that the forum was appropriately closed, but in the alternative, he also found that the Associated Students' decision to restrict funding, that is, eliminate media funding, was reasonable in light of the purposes of the forum. And the purposes of the forum are set forth in university policy that. . . Not the guidelines. We're back to the regent's policy. We're back to the regent's policies, not the standing rules, which say that the Associated Students must allocate student funding in accordance with the educational purposes of the university. And in this case, there's no allegation that that did not occur. So the reallocation itself was in furtherance of those educational purposes. The Associated Students just exercised its discretion to decide which activities it was going to fund rather than media funding. Okay. And so we have this record that's very clearly evidencing a response to a particular article that folks found offensive. What is your response to that? Do you think that's irrelevant? I think that the allegations of the underlying motive are irrelevant because of the content neutrality and viewpoint neutrality of the media amendment. Understood. You're significantly over your time. Okay. Richard, do you have anything more to say? No. Thank you so much for your argument. Thank you, Your Honor. It's a very interesting issue. Counsel? Thank you, Your Honor. Just a few points in rebuttal. First, on the 11th Amendment, the complaint speaks for itself as to the relief we seek, which is eligibility, restoration of eligibility to restore access to potential funding. There's no demand to cut a check. And the record shows, in fact, not all student groups get all the money they ask for. Some requests are denied in full or in part. If you look at ER 139 and 140 and 144, the request for judicial notice and sources cited there, paragraphs 10 to 25 on 140 and paragraph 11 on 144, you can see the history of how organizations are funded and not funded, and some are granted and some are denied. In fact, at ER 139, paragraph 14, you can see that COALA was actually denied in a particular quarter. Organizations still have to submit their applications. They have to apply on time, all the proper documents. It's no more ministerial than, say, welfare benefits, for example. You still have to demonstrate eligibility. But still, the state could not be immune from an order disqualifying Republicans from welfare benefits. On the merits, the problem with their definition of the form is that it would eviscerate the principle in Rosenberger and Cornelius, which is to say the government could simply evade First Amendment review by manipulating the scope of the form. And the form has to be defined with some stability. And at the very least, there's questions of fact as to the definition of the form, and certainly the issue is whether they've sliced off part of the form instead of closing the whole form. And on the facts pleaded, I think we're entitled to the benefit of those inferences for purposes of the 12b-6. In terms of reasonableness, before we even get to motive, what's relevant to reasonableness here is exactly the point that this was done clearly immediately following the publication of controversial content. And as I've pleaded in the complaint, at the very meeting where they adopted the disqualification, they had planned to create a media funds realignment program to continue and streamline media funding. There clearly was no preexisting plan or preexisting issue with media funding, that it was somehow unreasonable to fund student newspapers along with other student speech. It was introduced at the last minute. That is evidence both as to its unreasonableness and to viewpoint discrimination and retaliation. On the issue of viewpoint, a couple of points. The Supreme Court has been clear that on a university campus, universities can teach and foster and exhort students to be civil, but it may not restrict their speech, their private non-curricular speech, in the name of conventions of decency. If they commit a true threat or commit actual harassment, there can be consequences, but not for simply expressing points of view, however controversial. On the free press point, counsel alluded to Harris and McCrae. Yes, there may not be an absolute obligation to fund a protected activity, but once the government has created a fund for which the press is otherwise eligible or once there is revenue for which the press is otherwise eligible, be it public or private, it violates the free press clause to exclude the press from that fund. And, you know, the press does run on a shoestring budget, whether it's the student press or the non-student press. Profit margins are tight. And so if the government can withdraw a subsidy and disqualify the press, for example, from tax deductions on depreciation, that is punishment of the press. This is not a legislative act, Your Honor. This is an administrative act, an administrative body. This is not a statute. The student government is not a legislature. And O'Brien also does not apply because this is targeting pure speech. O'Brien was about conduct, not speech. And as the Supreme Court's made clear in Cornelius and Reed and recently in Masterpiece Cake Shop, when the government takes action to target pure speech and printing of newspapers as pure as pure speech gets, then we do look to motive. And the Supreme Court said that in both Cornelius and Reed. And Reed itself used the word motive. And that was even about a statute, about a legislative ordinance. This isn't legislation even. So either way, motive is relevant. And when you have a student government enacting what's essentially a disguised heckler's veto, we do look to motive in addition to reasonableness, in addition to disproportionate burdens on the press. And so for these reasons, if the Court has no further questions. Well, argued both sides. Very interesting case. Thank you so much for your argument. Thank you, Your Honor. We'll stand in recess. All rise.
judges: Fisher, Christen, Shea